members confer periodically and meet at least annually. **The committee considers the structure of the Fidelity funds' transfer agency fees, direct fees to investors, and the specific services rendered by FMR and its affiliates in consideration of these fees.** The committee also considers fee structures for other non-investment management services rendered to the Fidelity funds by FMR and its affiliates. During the fiscal year ended October 31, 2002, the committee held two meetings.

[Emphasis added.]

65.     The Statement of Additional Information also sets forth in greater detail the

purported process by which the investment managers are selected:

> In connection with their meetings, the Board of Trustees, including the non-interested Trustees, received materials specifically relating to the existing management contracts, and sub-advisory agreements (the Investment Advisory Contracts). These materials included (i) information on the investment performance of each fund, a peer group of funds, and an appropriate index or combination of indices, (ii) sales and redemption data in respect of each fund, and (iii) the economic outlook and the general investment outlook in the markets in which each fund invests. The Board of Trustees, including the non-interested Trustees, also considers periodically other material facts such as (1) the Investment advisers' results and financial conditions, (2) arrangement in respect of the distribution of each fund's shares, (3) the procedures employed to determine the value of each fund's assets, (4) **allocation of each fund's brokerage, if any, including allocations to brokers affiliated with the Investment Advisers, the use of "soft" commission dollars to pay fund expenses and to pay for research and other similar services, the allocation of brokerage to firms that sell Fidelity fund shares,** (5) the Investment Advisers' management of the relationships with each fund's custodian and subcustodians, (6) the resources devoted to and the record of compliance with each fund's investment policies and restrictions and with policies on personal securities transactions, and (7) the nature, cost and character of non-investment management services provided by the Investment Advisers and their affiliates.

> \*     \*     \*

> Based on its evaluations of all material factors and assisted by the advice of independent counsel, the Board of Trustees, including the non-interested Trustees, concluded that the existing advisory fee

> structures are fair, reasonable, and that the existing Investment
> Advisory Contracts should be continued.

[Emphasis added.] the Trustee Defendants, through their purportedly independent Committee on

Service Fees, are thus responsible for the review and approval and fee agreements between

Fidelity and the Fidelity Funds.

66.    With regard to the board of trustees' review and approval of the manner in which

Fidelity places portfolio transactions, the Statement of Additional Information states as follows:

"The Trustees of each fund periodically review FMR's performance of its responsibilities in

connection with the placement of portfolio transactions on behalf of the fund and review the

commissions paid by the fund over representative periods of time to determine if they are

reasonable in relation to the benefits to the fund."

67.    The Investment Company Institute ("ICI"), of which Fidelity Investment is a

member, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain
> convenient access to a professionally managed and diversified
> portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds,
> including strong legal protections and full disclosure. In addition,
> shareholders gain an extra layer of protection because each mutual
> fund has a board of directors looking out for shareholders'
> interests.
>
> **Unlike the directors of other corporations, mutual fund
> directors are responsible for protecting consumers, in this case,
> the funds' investors. The unique "watchdog" role, which does
> not exist in any other type of company in America, provides
> investors with the confidence of knowing the directors oversee
> the advisers who manage and service their investments.**
>
> **In particular, under the Investment Company Act of 1940, the
> board of directors of a mutual fund is charged with looking
> after how the fund operates and overseeing matters where the**

> **interests of the fund and its shareholders differ from the**
> **interests of its investment adviser or management company.**
> [Emphasis added.][1]

68.    In truth and in fact, the Fidelity Funds Boards of Directors, *i.e.*, the Trustee

Defendants, were captive to and controlled by the Investment Adviser Defendants, who induced

the Director Defendants to breach their statutory and fiduciary duties to manage and supervise

the Fidelity Funds, approve all significant agreements and otherwise take reasonable steps to

prevent the Investment Adviser Defendants from skimming Fidelity Funds assets. In many cases,

key Fidelity Funds Directors, were employees or former employees of Fidelity, and the Johnsons,

and were beholden for their positions, not to Fidelity Funds investors, but, rather, to Fidelity

whom they were supposed to oversee. The Trustee Defendants served for indefinite terms at the

pleasure of Fidelity and formed supposedly independent committees, charged with responsibility

for billions of dollars of fund assets (comprised largely of investors' college and retirement

savings).

69.    To ensure that the Trustee Defendants were complaint, Fidelity often selected key

fund trustees from its own ranks. For example, during the Class Period, defendant Ned Johnson

was the Chairman of the Board of trustees and an interested Trustee of at least 269 funds advised

by FMR or an affiliate. During the class Period, Ned Johnson also acted as Chief Executive

Officer, Chairman and Director of FMR Corp.; Director and Chairman of the Board and of the

Executive Committee of FMR; and Chairman and a Director of FMRC. Additionally, during the

---

[1]    The ICI describes itself as the national association of the U.S. investment company
industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end
funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members
have 86-6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The
quotation above is excepted from a paper entitled *Understanding the Role of Mutual Fund Directors*,
available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

Class Period, defendant Abigail Johnson was an interested Trustee of at least 269 funds advised

by FMR or an affiliate, and also acted as: a Senior Vice President of various Fidelity Funds;

President and a Director of FMR; President and a Director of FMRC; and a Director of FMR

Corp. Moreover, during the Class Period, defendant Lynch was an interested Trustee of at least

269 funds advised by FMR or an affiliate, and also acted as: Vice Chairman and a Director of

FMR; and Vice Chairman and a Director of FMRC.

      70.     In exchange for creating and managing the Fidelity Funds, Fidelity charged the

Fidelity Funds a variety of fees, each of which was calculated as a percentage of the funds' assets

net assets. Hence, the more money invested in the funds, the greater the fees paid to Fidelity. In

theory, the fees charged to fund investors are negotiated at arm's-length between the fund board

and the investment management company and must be approved by the independent members of

the board. However, as a result of the Trustee Defendants' dependence on the investment

management company, and its failure to properly manage the investment advisers, millions of

dollars in Fidelity Funds assets were transferred through fees payable from Fidelity Funds assets

to Fidelity that were of no benefit to fund investors.

      71.     As a result of these practices, the mutual fund industry was enormously profitable

for Fidelity. In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms
> was 18.8% last year, blowing away the 14.9% margin for the
> financial industry overall . . . [f]or the most part, customers do not
> enjoy the benefits of the economics of scale created by having
> larger funds. **Indeed, once a fund reaches a certain critical
> mass, the directors know that there is no discernible benefit
> from having the fund become bigger by drawing in more
> investors; in fact, they know the opposite to be true – once a
> fund becomes too large it loses the ability to trade in and out of
> positions without hurting its investors.** [...]

F:\FIDELITY\CMPLTAWA.WPD

18

* * *

**The [mutual fund] business grew 71-fold (20 fold in real terms)
in the two decades through 1999, yet costs as a percentage of
assets somehow managed to go up 29%.** . . . Fund vendors have
a way of stacking their boards with rubber stamps. As famed
investor Warren Buffett opines in Berkshire Hathaway's 2002
annual report: 'Tens of thousands of "independent" directors, over
more than six decades, have failed miserably.' A genuinely
independent board would occasionally fire an incompetent or
overcharging fund advisor. That happens just about never."

[Emphasis added.]

72.     On January 15, 2004, however, the SEC requested public comment on proposed

amendments to rules promulgated under the Investment Company Act, which would significantly

change fund governance practices. The amendments, which were adopted by the SEC on June

22, 2004 and will go into effect 18 months thereafter, require that independent directors comprise

at least seventy-five percent of mutual fund boards and that the boards retain a chairman who is

"independent" of the management company. In the latter respect, the relevant SEC Release

stated the following:

> We propose to require that the chairman of the fund board be an
> independent director. The Investment Company Act and state law
> are silent on who will fill this important role on fund boards.
> Today, a director who is also an officer of the fund's investment
> adviser serves as chairman of most, but not all, fund boards. In
> many cases, he (or she) also is the chief executive officer of the
> adviser. This practice may contribute to the adviser's ability to
> dominate the actions of the board of directors.
>
> The chairman of a fund board can largely control the board's
> agenda, which may include matters not welcomed by the adviser.
> The board is required to consider some matters annually in
> connection with the renewal of the advisory contract, but other
> matters the board considers at its discretion, such as termination of
> service providers, including the adviser. Perhaps more important,
> the chairman of the board can have a substantial influence on the
> fund boardroom's culture. The boardroom culture can foster (or
> suppress) the type of meaningful dialogue between fund

management and independent directors that is critical for healthy
fund governance. It can support (or diminish) the role of the
independent directors in the continuous, active engagement of fund
management necessary for them to fulfill their duties.

**A boardroom culture conducive to decisions favoring the long-
term interest of fund shareholders may be more likely to
prevail when the board chairman does not have the conflicts of
interest inherent in his role as an executive of the fund adviser.
Moreover, a fund board may be more effective when
negotiating with the fund adviser over matters such as the
advisory fee if it were not at the same time led by an executive
of the adviser with whom it is negotiating. If such negotiation
leads to lower advisory and other fees, shareholders would
stand to benefit substantially.**

[Emphasis added.]

73.    The amendments had the support of all living former SEC Chairmen, including

Harvey Pitt and Arthur Levitt, who wrote in a June 15, 2004 letter to SEC Secretary Jonathan

Katz, signed by David S. Ruder on behalf of all seven former Chairmen, that:

An independent mutual fund board chairman would provide
necessary support and direction for independent fund directors in
fulfilling their duties by setting the board's agenda, controlling the
conduct of meetings, and enhancing meaningful dialogue with the
adviser. **We believe an independent boar chairman would be
better able to create conditions favoring the long-term interests
of fund shareholders than would a chairman who is an
executive of the adviser.**

[Emphasis added.]

74.    In a February 17, 2004 *Wall Street Journal* editorial entitled "Interested, and

Proud of It," Ned Johnson criticized the SEC's proposal. "Proud to disclose" his "vested

interest" in the funds he manages, Johnson asserted that fund chairmen with ownership stakes in

a fund's management company, most notably himself, should retain their dominance over fund

policy because, among other reasons, "There will always be risk of malfeasance in any industry."

75.    Johnson criticized the SEC's proposal for encroaching upon "shareholder democracy," or investors' ability to influence fund governance policy by withdrawing assets from underperforming fund families. Johnson argued that such "shareholder democracy" had adequately protected mutual fund investors in the past. Dismissing the normative benefits securities legislation has on executives' wrongful conduct, Johnson further wrote," It i the moral fiber and effectiveness of the men and women in charge and in the trenches - **not laws or chairperson's so-called independence** that provide shareholders with the greatest degree of protection." [Emphasis added.] Johnson continued,

> Regulators want to substitute a law in place of shareholders' judgment, by mandating that mutual fund chairpersons be "independent." If this rule is adopted, the immediate result will be to reduce the expertise and hands-on "feel" of mutual-fund board chairs across the industry, whose long experience equips them to detect subtle nuances in fund operations.

76.    Moreover, while conceding that "having an independent chairperson is [not] always a bad choice," and "fund chairpersons should be accountable and subject to series independent oversight," Johnson stated that:,

> Mandating an independent chairperson is akin to requiring that every ship have two captains. I don't know about you, but if a ship I was sailing on were headed for an iceberg, I'd want one - and on one - captain giving orders. I'd like to know that he'd spent some time at sea and knew what he was doing - and if he owned the ship, so much the better.

77.    For the three fiscal years ended March 31, 2003, Fidelity mutual fund investors paid management fees totaling $1.6 billion, despite a loss of 24% in 2001, a loss in value in 2002 and a loss in value of 25% in 2003. Over the last decade, investors in the Fidelity Magellan Fund have paid $4 billion in management fees yet the defendants' advice has led to a significant under-performance compared to the S&P 500 Index. In the words of Vanguard Group Inc. founder

John C. Bogle, "When there are two clearly distinct corporate ships -- the management company and the fund, each with its own set of owners -- there ought to be two captains."

78.    Due in large part to the conflicted boardroom culture created by Fidelity's interested directors, specifically including its chairman Ned Johnson, plaintiffs and other members of the Class never knew, nor could they have known, from reading the fund prospectus or otherwise, of the extent to which Fidelity was using, *inter alia*, so-called 12b-1 fees, Soft Dollars (as defined below) and directed brokerage commission to improperly siphon assets from the funds to assist in peddling its wares to unwitting investors.

79.    Plaintiffs and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which the Investment Adviser Defendants were using so-called 12b-1 fees, Soft Dollars (as defined below) and commissions to improperly siphon assets from the funds.

### Fidelity Used Rule 12b-1 Marketing
### Fees For Improper Purposes

80.    Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and

evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued." The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that there is a reasonable likelihood that the plan will benefit the company and its shareholders." [Emphasis added.]

81.    The Rule 12b-1 exceptions to the Section 12(b) prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Trustee Defendants authorized, and Fidelity collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

82.    However, the purported Rule 12b-1 fees charged to Fidelity Funds investors were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the plan would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to Fidelity Funds investors.

83.    Significant economies of scale exist when a fund's assets under management increase more quickly than the cost of advising and managing those assets. For example, the cost of providing investment advisory services, including portfolio selection services, to the Fidelity Funds might be $X for the first $100 million of assets under management but the cost of

providing those same services for the next $100 million is a mere fraction of $X. This is true in part because each Fund's investment objectives are set forth in their offering documentation and additional dollars contributed by shareholders are simply invested in the same core portfolio of securities.

84.    The assets under management in the Fidelity Funds have grown dramatically in the past decade, even accounting for the stock market declines experienced in recent years. For example:

a.    At the close of 1993, the Fidelity Contrafund had just over $6.2 billion in assets under management and defendants received almost $26 million in management fees. According to recent regulatory filings, by December 31, 2003, this fund's assets had jumped to nearly $36 billion and fees had soared to over $176 million per year. Therefore, assets under management increased more than five times during this period and management fees grew at a comparable or greater rate, demonstrating that any economies of scale created did not inure to the benefit of the Contrafund investors.

b.    In early 1994, the Fidelity Magellan Fund had over $33 billion assets under management and defendants were paid approximately $186.5 million in management fees. From the March 2004 annual report, Fidelity Magellan Fund assets increased further to over $66 billion while fees increased to over $370 million in a single year for a single fund portfolio. Assets under management therefore doubled during this period and management fees grew at a comparable rate, demonstrating that any economies of scale created did not inure to the benefit of the Magellan Fund investors.

c.    In 1994, the Fidelity Growth & Income Fund had over $8.7 billion in assets under management, and defendants received approximately $41 million in total

management fees. According to recent regulatory filings, by July of 2003, this fund's assets had jumped to over $28 billion while fees paid to the defendants soared to nearly $130 million in a single year. Therefore, assets under management tripled during this period and management fees drew at a comparable rate, demonstrating that any economies of scale created did not inure to the benefit of the Fidelity Growth & Income Fund investors.

d.      For the year ending July 1994, the Fidelity Blue Chip Growth Fund had over $2.2 billion in assets under management while defendants received approximately $8.5 million in management fees. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to over $100 million per year, again for a single portfolio. Therefore, assets under management increased more than nine times during this period and management fees grew at a comparable or greater rate, demonstrating that any economies of scale created did not inure to the benefit of the Blue Chip Growth Fund investors.

e.      In 1994, the Fidelity Low-Priced Stock Fund had just over $2 billion in assets under management and defendants received almost $14 million in management fees. According to recent regulatory filings, by July 2003, this fund's assets had jumped to almost $20 billion while fees soared to almost $100 million for another single portfolio. Therefore, assets under management increased ten times during this period and management fees grew at a nearly comparable rate, demonstrating that any economies of scale create did not inure to the benefit of the Blue Chip Growth Fund investors.

85.     As of late 1993 to early 1994, the management fees for the Fidelity Funds discussed immediately above totaled approximately $275 million. As of the most recent reporting period, annual management fees for such funds exceeded $876 million. This represents roughly a three-fold increase in fees, an increase directly proportional to the increase in size of

F:\FIDELITY\CMPLTAWA.WPD

the funds under management. In other words, the defendants have retained all of the benefits

resulting from economics of scale, benefits that are owned by, and should have been paid to, the

Fidelity Funds and Fidelity Funds investors.

86.    Additionally, technological advances have increased the economies of scale and

reduced the coss of providing investment advisory services to the vast number of shareholder

accounts the defendants are charged with overseeing. As summarized in a rare, November 6.

1994 *Boston Globe* interview with Ned Johnson, Fidelity

> was, for a while, the heaviest single buyer of Wall Street Journal
> ads. [Johnson] also invested heavily in computer, which allowed
> investors instant access to their own accounts. These innovations
> and strategics set the pace for [what was then] a $2 trillion mutual
> fund industry. Combined with the talents of Peter Lynch and a
> cadre of fund managers who repeated put Fidelity at the top of the
> performance lists, the company benefitted more than any other
> from the explosion of mutual fund investing in the 1980s.

87.    A July 23, 1995 *Boston Globe* article also noted Fidelity's historical reputation for

investing heavily in technology to streamline fund operations. The article stated the following:

> Just as Fidelity's ads created waves, so its state-of-the-art computer
> systems set the industry standard. Stories abound of Johnson's
> fascination with computers, a passion as abiding as his father's
> interest in the stock market... For a two-year period in the mid
> 1980s, Johnson plowed more than $150 million into computers and
> backup systems each year.

88.    A January 8, 2004 article in the newsletter *Running Money* entitled "The

Emerging 'One Fidelity' Juggernaut" stated the following regarding Fidelity's investments in

technology:

> Fidelity spends massively on technology. [Ex-Fidelity tech
> executive Robert] Hegarty, now a vice president at research firm
> TowerGroup, says Fidelity spends $515 million a year on
> technology just for its asset management business - which is a jaw-
> dropping 10% of all IT spending in the asset management industry.

"And over the last four or five years, they've gotten much smarter about managing their IT budget," he says.

Thanks to better budgeting and lower tech costs, Fidelity's overall tech budget has come down from 42 billion a year to $1.8 billion. About two-thirds of the money is spent on its 7,000-strong technology staff, but the emphasis on technology starts with Johnson. "He gets more involved in technology than any other CEO on Wall Street," says Donald Haile, who oversees Fidelity's internal technology and communications infrastructure. How involved? Haile, a longtime IBM veteran before coming to Fidelity, meets with Johnson every other week and speaks with him weekly.

Technology allows Fidelity to handle 81% of its customer contact over the Web, up from 78% a year earlier. That's important because a customer session online costs just 5% of one over the phone. [...]

So Fidelity has built the most visited Web site of any mutual fund company. Fidelity.com draws more than twice as many monthly visitors as Vanguard.com, according to Nielsen/NetRatings. It even draws more Web page views than many online brokers, including Charles Schwab and E*Trade.

89.    The benefits of such economies of scale belong to the Fidelity Funds and Fidelity Funds investors and should have been passed on to them through lower fees, including the use of breakpoints. The agreements between the defendants and the Fidelity Funds do not incorporate breakpoints although the defendants offer breakpoints to other institutional clients. There are higher costs inherent in running a smaller fund, and conversely, lower costs in running a larger fund. The Fidelity Funds are among the largest in the world and, accordingly, should be among the least expensive in the world to advise.

90.    Rather, Fidelity Funds management and other fees steadily increased throughout the Class Period, including those for funds which grew to gargantuan proportions, such as the Magellan Fund (currently with over $65 billion in assets under management), the Contrafund

(currently with over $39 billion in assets under management) and the Puritan Fund (currently with over $22 billion in assets under management). This was a red flag that the Trustee Defendants knowingly or recklessly disregarded. In truth, the Fidelity Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. If the Trustee Defendants reviewed written reports of the amounts expended pursuant to the Fidelity Funds Rule 12b-1 plans, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 plans, on a quarterly basis as required — which seem highly unlikely under the circumstances set forth herein — the Trustee Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 plans, even though such payments not only harmed existing Fidelity Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective Fidelity Funds investors.

91.    Many of the Fidelity Funds charging Rule 12b-1 fees charged investors the maximum fees permissible pursuant to the Fidelity Funds Rule 12b-1 plans. There was no reasonable likelihood that the Rule 12b-1 fees would benefit the funds or their shareholders because the fees charged to shareholders failed to reflect diminished marginal costs. Therefore, the Rule 12b-1 plans authorizing such fees should have been terminated.

92.    As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers, in the form of excess commissions that were not disclosed or authorized by the Fidelity Funds Rule 12b-1 plan.

### Fidelity Charged Its Overhead To Fidelity Investors, Despite Its Own In-House And Secretly Paid Excessive Commissions To Brokers To Steer Clients To Fidelity Funds

93.    Investment advisers routinely pay broker commissions on the purchase and sale of

fund securities, and such commissions may, under certain circumstances, properly be used to

purchase certain other services from brokers as well.  Specifically, the Section 28(e) "safe

harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires

investment management companies to obtain the best possible execution price for their trades.

Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary

duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of

the amount of commission another . . . broker . . . would have charged for effecting the

transaction, if such person determined **in good faith** that the amount of the commission is

reasonable in relation to the value of the brokerage and research services provided."  15 U.S.C.

§28(e) (emphasis added).  In other words, funds are allowed to include in "commissions"

payment for not only purchase and sales execution, but also for specified services, which the

SEC has defined to include, "any service that provides lawful and appropriate assistance to the

money manager in the performance of his investment decision-making responsibilities."  The

commission amounts charged by brokerages to investment advisers in excess of the purchase and

sale charges are known within the industry as "Soft Dollars."

94.    Since its inception, Fidelity has actively promoted itself as, and earned a

reputation  for being, a paragon on financial investment research firms.  Fidelity touts the fact

that it has poured hundreds of millions of dollars into its own proprietary research apparatus,

thus, presumably obviating the need for reliance on outside research.  Yet, contrary to Fidelity's

reputation for cultivating its enormous in-house research staff, Fidelity went far beyond what is

permitted by the Section 28(e) safe harbor by paying third parties for "research services' that

provided no reasonable benefits to Fidelity Funds investors.

95.    As stated on the Fidelity website, "When Edward C. Johnson 2d became president

and director of the small, Boston-based Fidelity in 1943, he instituted an approach to money management that remains the hallmark of Fidelity's investment culture today.  Mr. Johnson believed that making money for shareholders was best accomplished through intensive market research . . ." http://personal.fidelity.com/products/funds/content/approach.html.

96.    Fidelity currently markets itself to investors as the employer of the "largest staff of portfolio managers, analysts, and traders in the mutual fund industry, more than 600 worldwide." *Id.*  Each one, according to the company's website, "shares one common trait with Mr. Johnson: a deep and abiding passion for research."  *Id.*  "[Fidelity's] team of analysts," according to the site, 'publishes nearly 25,000 research reports annually and follows more than 4,800 companies, arming [its] fund managers with every resource available to uncover new investment opportunities in the global marketplace."  *Id.*  On its international site, Fidelity stresses that "with over 450 fund managers and analysts, we believe our research resources are unrivalled within the industry.  These investment professional carry out in-depth analysts to uncover the best opportunities, following our proven bottom-up stockpiling approach."  http://www.fidelity-international.com/about.

97.    On August 31, 1998, *Financial News* announced that "Fidelity Investments has the best global in-house equity research, according to a poll of polls."  Together with Capital Group, the article stated, "the two firms form an elite of global in-house research and have an astonishing lead over third-placed JP Morgan Investment Management."

98.    In February 2004, the *South China Morning Post* announced that Fidelity had won yet another award for its research, the paper's 2003 Fund Manager of the Year Award.  Douglas Naismith, managing director of Fidelity Investments in Hong Kong, told the paper:

We are a research-driven company and that is our investment

31

philosophy, quite simply. You need a big in-house research team
to attain the consistency. You need to know what companies you
want to hold and what companies you do not want to hold -- you
need to know both sides of the coin.

Mr. Naismith further stated that generating sound, thoroughly researched investment ideas is

"crucial" to Fidelity's achievement of outstanding performance.

99.    Inconsistent with its highly-touted reputation for in-house research, Fidelity

exceeded the bounds of the Section 28(e) safe harbor by using Soft Dollars to pay overhead costs,

thus charging Fidelity Funds investors for costs not covered by the Section 28(e) safe harbor and

that, consistent with the investment advisers' fiduciary duties, properly should have been borne

by Fidelity. Fidelity also paid excessive commissions to broker-dealers, which insofar as they

were given under the guise of Soft Dollars, were a sham and utterly unjustifiable in light of

Fidelity's in-house research apparatus. The purpose of these payments and Fidelity's directing

brokerage business to firms to that favored Fidelity Funds was to induce the brokers to steer their

clients to Fidelity Funds. Such payments and directed-brokerage payments were used to fund

sales contests and other undisclosed financial incentives to push Fidelity Funds. These

incentives created an undisclosed conflict of interest and caused brokers to steer clients to

Fidelity Funds regardless of the funds' investment quality relative to other investment

alternatives and to thereby breach their duties of loyalty. By paying the excessive brokerage

commissions, Fidelity also violated Section 12(b) of the Investment Company Act because such

payments were not made pursuant to valid Rule 12b-1 plans.

100.    In a June 28, 2004 article entitled "Fidelity Toughens Up Against Soft Dollars for

Market Data — Fidelity to Cease Paying Extra to Get Data From Brokers," *The Wall Street*

*Journal* reported that Fidelity was discontinuing its Soft Dollar Payments to brokers for certain

services. The story stated the following:

> Starting July 1, the nation's largest mutual-fund company will stop
> paying extra sums in brokerage commission to gain access to
> market data from Bloomberg LP and other information providers,
> Fidelity Investments executives said. Instead, Fidelity will buy
> such services directly, paying cash out of its own pocket.
>
>         \*   \*   \*
>
> Eric Roiter, general counsel of Fidelity's investment-management
> arm, said the decision to pay directly for market data is expected to
> cost Fidelity \$40 million to \$50 million this year. Mr. Roiter said
> the company is negotiating with brokers to return commission
> money formerly earmarked for market data back to the mutual
> funds, where it will lower investor expenses. "We are simply
> putting our money where our mouth is," Mr. Roiter said. "We hear
> the consternation about soft dollars."
>
> Boston-based Fidelity isn't changing the way it pays for investment
> research, the biggest chunk of its soft-dollar payments. Fidelity
> said its stock mutual funds last year paid 4815 million in
> commission, of which it estimates about \$160 million went for
> soft-dollar research and market data. Overall, mutual-fund and
> other institutional investors shelled out \$1.24 billion last year in
> soft-dollar payments, down from \$1.52 billion in 2002, according
> to consultant Greenwich Associates.

This article evidences Fidelity's ongoing misconduct and purported response to the growing

scrutiny over the propriety of Soft Dollars, and that eliminating them can directly lower

investors' expenses.

    101.   According to the Statement of Additional Information, during the fiscal year

ended October 31, 2002, the Fidelity Diversified International Fund alone paid \$7,085,357 in

commission to firms for providing research services. The excessive commissions did not fund

any services that benefited the Fidelity Funds shareholders, and these practices materially harmed

plaintiffs and other members of the Class from whom the Soft Dollars and excessive commission

were taken.

102.    Additionally, on information and belief, the Fidelity Funds, similar to other members of the industry, have a practice of charging lower management fees to institutional clients than to ordinary mutual fund investors through their mutual fund holdings. This discriminatory treatment cannot be justified by any additional services to the ordinary investor and is a further breach of fiduciary duties. In the words of Morningstar analyst Kunal Kapoor, "Fees for a firm's retail products should not be materially different from management fees for a firm's institutional offerings. Though we appreciate the added coss of servicing smaller accounts, those expenses needn't show up in the management fees." Kunal Kapoor, "The Stands That We Expect Funds to Meet," Morningstar.com, Dec. 8, 2003.

103.    The Investment Adviser Defendants' actions are not protected by the Section 28(e) safe harbor. The Investment Adviser Defendants used Soft Dollars to pay overhead costs (for items such as computer hardware and software) thus charging Fidelity Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties, properly should have been borne by the Investment Adviser Defendants. The Investment Adviser Defendants also paid excessive commissions to broker dealers on top of any legitimate Soft Dollars to steer their clients to Fidelity Funds and directed brokerage business to firms that favored Fidelity Funds. Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push Fidelity Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients to Fidelity Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty. By paying the excessive brokerage commissions, the Investment Adviser Defendants also violated Section 12(b) of the Investment Company Act, because such payments were not made pursuant to a valid Rule 12b-1

plan.

## THE NOVEMBER 17, 2003 ANNOUNCEMENT

104.    On November 17, 2003, these practices began to come to light when the SEC

issued a press release (the "November 17 SEC Release") in which it announced a $50 million

settlement of an enforcement action against Morgan Stanley Dean Witter relating to improper

mutual fund sales practices. The Fidelity Funds were subsequently identified as one of the

mutual fund families that Morgan Stanley brokers were paid to push. In this regard, the release

announced:

> the institution and simultaneous settlement of an enforcement
> action against Morgan Stanley DW Inc. (Morgan Stanley) for
> failing to provide customers important information relating to their
> purchases of mutual fund shares. As part of the settlement,
> Morgan Stanley will pay $50 million in disgorgement and
> penalties, all of which will be placed in a Fair Fund for distribution
> to certain Morgan Stanley customers.
>
> **Stemming from the SEC's ongoing industry-wide investigation
> of mutual fund sales practices, this inquiry uncovered two
> distinct, firm-wide disclosure failures by Morgan Stanley. The
> first relates to Morgan Stanley's "Partners Program" and its
> predecessor, in which a select group of mutual fund complex
> paid Morgan Stanley substantial fees for preferred marketing
> of their funds.** To incentivize its sales force to recommend the
> purchase of shares in these "preferred" funds, Morgan Stanley paid
> increased compensation to individual registered representatives and
> branch managers on sales of those funds' shares. The fund
> complexes paid these fees in cash or in the form of portfolio
> brokerage commissions.

[Emphasis added.]

105.    The November 17 SEC release further stated:

> The Commission's Order finds that this conduct violated Section
> 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the
> Securities Exchange Act of 1934. Section 17(a)(2) prohibits the
> making of materially misleading statements or omissions in the