## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**04   10584   NG**

---------------------------------------------- x

ERIC FORSYTHE, Individually And On Behalf Of All
Others Similarly Situated,

            Plaintiff,

    vs.

SUN LIFE FINANCIAL INC., MASSACHUSETTS
FINANCIAL SERVICES COMPANY (d/b/a "MFS
INVESTMENT MANAGEMENT"), JEFFREY L.
SHAMES, JOHN W. BALLEN, KEVIN J. PARKE,
LAWRENCE H. COHN, WILLIAM R. GUTOW, J.
ATWOOD IVES, ABBY M. O'NEILL, LAWRENCE
T. PERERA, WILLIAM J. POORVU, J. DALE
SHERRATT, ELAINE R. SMITH, WARD SMITH, and
JOHN DOES 1-100,

            Defendants,

MFS CAPITAL OPPORTUNITIES FUND, MFS
CORE GROWTH FUND, MFS EMERGING
GROWTH FUND, MFS GROWTH OPPORTUNITIES
FUND, MFS LARGE CAP GROWTH FUND, MFS
MANAGED SECTORS FUND, MFS MID CAP
GROWTH FUND, MFS NEW DISCOVERY FUND,
MFS NEW ENDEAVOR FUND, MFS RESEARCH
FUND, MFS STRATEGIC GROWTH FUND, MFS
TECHNOLOGY FUND, MASSACHUSETTS
INVESTORS GROWTH STOCK, MFS MID CAP
VALUE FUND, MFS RESEARCH GROWTH AND
INCOME FUND, MFS STRATEGIC VALUE FUND,
MFS TOTAL RETURN FUND, MFS UNION
STANDARD EQUITY FUND, MFS UTILITIES
FUND, MFS VALUE FUND, MASSACHUSETTS
INVESTORS TRUST, MFS AGGRESSIVE GROWTH
ALLOCATION FUND, MFS CONSERVATIVE
ALLOCATION FUND, MFS GROWTH
ALLOCATION FUND, MFS MODERATE
ALLOCATION FUND, MFS BOND FUND, MFS
EMERGING MARKETS DEBT FUND, MFS
GOVERNMENT LIMITED MATURITY FUND, MFS

---------------------------------------------- x

**[CAPTION CONTINUES ON NEXT PAGE]**

Civil Action No. _____

**CLASS ACTION COMPLAINT
FOR EXCESSIVE FEES IN
VIOLATION OF SECTIONS
34(b), 36(b) AND 48(a) OF THE
INVESTMENT COMPANY ACT
AND SECTIONS 206 AND 215 OF
THE INVESTMENT ADVISERS
ACT, AND FOR BREACHES OF
FIDUCIARY DUTY**

MAGISTRATE JUDGE Alexander

**JURY TRIAL DEMANDED**

RECEIPT #_____
AMOUNT $ 150
SUMMONS ISSUED Yes
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK. T.O.M
DATE 3/25/04

```
                                                    x
                                                    :
GOVERNMENT MORTGAGE FUND,                           :
MFS GOVERNMENT SECURITIES FUND,                     :
MFS HIGH INCOME FUND, MFS HIGH YIELD                :
OPPORTUNITIES FUND, MFS INTERMEDIATE                :
INVESTMENT GRADE BOND FUND, MFS                     :
LIMITED MATURITY FUND, MFS RESEARCH                 :
BOND FUND, MFS STRATEGIC INCOME FUND,               :
MFS ALABAMA MUNICIPAL BOND FUND,                    :
MFS ARKANSAS MUNICIPAL BOND FUND, MFS               :
CALIFORNIA MUNICIPAL BOND FUND, MFS                 :
FLORIDA MUNICIPAL BOND FUND, MFS                    :
GEORGIA MUNICIPAL BOND FUND, MFS                    :
MARYLAND MUNICIPAL BOND FUND, MFS                   :
MASSACHUSETTS MUNICIPAL BOND FUND,                  :
MFS MISSISSIPPI MUNICIPAL BOND FUND, MFS            :
MUNICIPAL BOND FUND, MFS MUNICIPAL                  :
LIMITED MATURITY FUND, MFS NEW YORK                 :
MUNICIPAL BOND FUND, MFS NORTH                      :
CAROLINA MUNICIPAL BOND FUND, MFS                   :
PENNSYLVANIA MUNICIPAL BOND FUND, MFS               :
SOUTH CAROLINA MUNICIPAL BOND FUND,                 :
MFS TENNESSEE MUNICIPAL BOND FUND, MFS              :
VIRGINIA MUNICIPAL BOND FUND, MFS WEST              :
VIRGINIA MUNICIPAL BOND FUND, MFS                   :
EMERGING MARKETS EQUITY FUND, MFS                   :
GLOBAL EQUITY FUND, MFS GLOBAL GROWTH               :
FUND, MFS GLOBAL TOTAL RETURN FUND, MFS             :
INTERNATIONAL GROWTH FUND, MFS                      :
INTERNATIONAL NEW DISCOVERY FUND, MFS               :
INTERNATIONAL VALUE FUND, MFS RESEARCH              :
INTERNATIONAL FUND, MFS CASH RESERVE                :
FUND, MFS GOVERNMENT MONEY MARKET                   :
FUND, MFS MONEY MARKET FUND (collectively           :
known as "MFS FUNDS")                               :
                                                    :
                            Nominal Defendants.     :
                                                    x
```

Plaintiff, by and through his counsel, alleges the following based upon the investigation

of counsel, which included a review of United States Securities and Exchange Commission

("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media

reports, news articles, academic literature, and academic studies.  Plaintiff believes that

substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    Plaintiff brings this action as a class action on behalf of investors in mutual funds belonging to the Massachusetts Financial Services family of mutual funds (i.e., the "MFS Funds," as defined in the caption above and on the list annexed hereto as Exhibit A) and derivatively on behalf of the MFS Funds, against the MFS Funds investment advisers, their corporate parents and the MFS Funds trustees.

2.    This complaint alleges that Massachusetts Financial Services Company ("MFS Company") drew upon the assets of the MFS Funds to pay brokers to aggressively push MFS Funds over other funds, and that MFS Company concealed such payments from investors by disguising them as brokerage commissions. Such brokerage commissions, though payable from fund assets, were not disclosed to investors in the MFS Funds public filings or elsewhere.

3.    Thus MFS Funds investors were induced to purchase MFS Funds by brokers who received undisclosed payments from MFS Company to push MFS Funds over other mutual funds and who therefore had an undisclosed conflict of interest. Then, once invested in one or more of the MFS Funds, MFS Funds investors were charged and paid undisclosed fees that were improperly used to pay brokers to aggressively push MFS Funds to still other brokerage clients.

4.    MFS Company was motivated to make these secret payments to finance the improper marketing of MFS Funds because its fees were calculated as a percentage of the funds' average daily net asset value and, therefore, tended to increase as the number of MFS Funds investors grew. MFS Company attempted to justify this conduct on the ground that by increasing the MFS Funds assets they were creating economies of scale that inured to the benefit of investors but, in truth and in fact, MFS Funds investors received none of the benefits of these

3

purported economies of scale.  Yet, during the Class Period (as defined herein), MFS Company

continued to skim millions from the MFS Funds to finance their ongoing marketing campaign.

The MFS Funds trustees, who purported to be MFS Funds investor watchdogs, knowingly or

recklessly permitted this conduct to occur.

   5.  By engaging in this conduct, MFS Company and the defendant entities that

control it breached their statutorily-defined fiduciary duties under Sections 36(a) and (b) of the

Investment Company Act of 1940 (the "Investment Company Act") and Section 206 of the

Investment Advisers Act of 1940 (the "Investment Advisers Act"), breached their common law

fiduciary duties, and knowingly aided and abetted the brokers in the breach of fiduciary duties to

their clients.  MFS Company also violated Section 34(b) of the Investment Company Act

because, to further its improper course of conduct, it made untrue statements of material fact in

fund registration statements and omitted to disclose material facts concerning the procedure for

determining the amount of fees payable to MFS Company and concerning the improper uses to

which the fees were put.  Additionally, the MFS Funds trustees breached their common law

fiduciary duties to the MFS Funds investors by knowingly and/or recklessly allowing the

improper conduct alleged herein to occur and harm MFS Funds investors.

   6.  On January 28, 2004, the *Los Angeles Times* published an article about a Senate

committee hearing on mutual fund abuses which stated, in pertinent part, as follows:

> "The mutual fund industry is indeed the world's largest skimming
> operation," said Sen. Peter Fitzgerald (R-Ill.), chairman of the
> panel, comparing the scandal-plagued industry to "a $7-trillion
> trough" exploited by fund managers, brokers and other insiders.

## JURISDICTION AND VENUE

   7.  The claims asserted herein arise under and pursuant to Sections 34(b), 36(b) and

48(a) of the Investment Company Act, 15 U.S.C. §§80a-33(b), 80a-35(a) and (b) and 80a-47(a),

4

Sections 206 and 215 of the Investment Advisers Act, 15 U.S.C. §§80b-6 and 80b-15, and common law.

8.    This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43; Section 214 of the Investment Advisers Act, 15 U.S.C. §80b-14; and 28 U.S.C. § 1391(b).

9.    Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District. Defendant MFS Company was an active participant in the wrongful conduct alleged herein and is headquartered within this District, at 500 Boylston Street, Boston, Massachusetts 02116.

10.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.    Plaintiff Eric Forsythe ("Plaintiff") purchased during the Class Period and continues to own shares or units of the Massachusetts Investors Trust and has been damaged by the conduct alleged herein.

12.    Defendant Sun Life Financial Inc. ("Sun Life") is a financial services company and the ultimate parent of defendants bearing the MFS name. MFS Company is a subsidiary of Sun Life of Canada (U.S.) Financial Services Holdings, Inc., which in turn is an indirect wholly-owned subsidiary of Sun Life. Sun Life maintains its U.S. office at One Sun Life Executive Park SC 2132, Wellesley Hills, Massachusetts 02481.

5

13.     Defendant MFS Company is a subsidiary of Sun Life and offers investment products and money management services. MFS Company is registered as an investment adviser under the Investment Advisers Act and managed and advised the MFS Funds during the Class Period. MFS Company has ultimate responsibility for overseeing the day-to-day management of the MFS Funds. MFS Company, which conducts its advisory business under the name MFS Investment Management, is headquartered at 500 Boylston Street, Boston, Massachusetts 02116. ("MFS Company" and "MFS Investment Management" are referred to interchangeably herein). Investment management fees payable to MFS Company are calculated as a percentage of the funds' average daily net asset value.

14.     During the Class Period, defendant Jeffrey L. Shames ("Shames") was a Chairman and Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. Additionally, Shames served as Chairman of MFS Company during the Class Period. Shames' business address is 500 Boylston Street, Boston, Massachusetts 02116.

15.     During the Class Period, defendant John W. Ballen ("Ballen") was the President and Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. Additionally, Ballen served as Chief Executive Officer and Director of MFS Company during the Class Period. Ballen's business address is 500 Boylston Street, Boston, Massachusetts 02116.

16.     During the Class Period, defendant Kevin J. Parke ("Parke") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. Additionally, Parke served as President, Chief Investment Officer and Director of the MFS Company during the Class Period. Parke's business address is 500 Boylston Street, Boston, Massachusetts 02116.

6

17.    During the Class Period, defendant Lawrence H. Cohn, M.D. ("Cohn") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Cohn received compensation of $148,006 for the calendar year ended 2002. Cohn's business address is Brigham and Women's Hospital, PBB J-101, 75 Francis Street, Boston, Massachusetts 02115.

18.    During the Class Period, defendant William R. Gutow ("Gutow") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Gutow received compensation of $148,006 for the calendar year ended 2002. Gutow's business address is 500 Boylston Street, Boston, Massachusetts 02116.

19.    During the Class Period, defendant J. Atwood Ives ("Ives") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Ives received compensation of $164,031 for the calendar year ended 2002. Ives' business address is 500 Boylston Street, Boston, Massachusetts 02116.

20.    During the Class Period, defendant Abby M. O'Neill ("O'Neill") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For her service as a Trustee overseeing the MFS fund complex, O'Neill received compensation of $146,450 for the calendar year ended 2002. O'Neill's business address is 500 Boylston Street, Boston, Massachusetts 02116.

21.    During the Class Period, defendant Lawrence T. Perera ("Perera") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Perera received compensation of

$151,574 for the calendar year ended 2002. Perera's business address is 60 State Street, Boston, Massachusetts 02109.

22.    During the Class Period, defendant William J. Poorvu ("Poorvu") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Poorvu received compensation of $161,463 for the calendar year ended 2002. Poorvu's business address is Harvard Business School, MBA Admissions, Dillon House, Soldiers Field Road, Boston, Massachusetts 02163.

23.    During the Class Period, defendant J. Dale Sherratt ("Sherratt") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Sherratt received compensation of $149,006 for the calendar year ended 2002. Sherratt's business address is 500 Boylston Street, Boston, Massachusetts 02116.

24.    During the Class Period, defendant Elaine R. Smith ("Elaine Smith") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For her service as a Trustee overseeing the MFS fund complex, Elaine Smith received compensation of $152,574 for the calendar year ended 2002. Elaine Smith's business address is 500 Boylston Street, Boston, Massachusetts 02116.

25.    During the Class Period, defendant Ward Smith ("Ward Smith") was a Trustee charged with overseeing all of the 112 funds that make up the MFS fund complex. For his service as a Trustee overseeing the MFS fund complex, Ward Smith received compensation of $165,334 for the calendar year ended 2002. Ward Smith's business address is 500 Boylston Street, Boston, Massachusetts 02116.

26.    Defendants John Does 1-100 were Trustees charged with overseeing the MFS fund complex during the Class Period, and any other wrongdoers later discovered, whose

8

identities have yet to be ascertained and which will be determined during the course of Plaintiffs' counsel's ongoing investigation.

27.     Defendants Shames, Ballen, Parke, Cohn, Gutow, Ives, O'Neill, Perera, Poorvu, Sherratt, Elaine Smith, Ward Smith, and John Does 1-100 are referred to collectively herein as the "Trustee Defendants."

28.     Nominal defendants the MFS Funds are open-ended management companies consisting of the capital invested by mutual fund shareholders, each having a board of trustees charged with representing the interests of the shareholders in one or a series of the funds. The MFS Funds are named as nominal defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

29.     Plaintiff brings certain of these claims as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased, redeemed or held shares or like interests in any of the MFS Funds between March 24, 1999 and November 17, 2003, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

30.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are many thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the MFS Funds and MFS Company and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

32.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

33.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the Investment Company Act was violated by defendants' acts as alleged herein;

(b)    whether the Investment Advisers Act was violated by defendants' acts as alleged herein;

(c)    whether MFS Company breached its common law fiduciary duties and/or knowingly aided and abetted common law breaches of fiduciary duties;

(d)    whether statements made by defendants to the investing public during the Class Period misrepresented or omitted to disclose material facts about the business, operations and financial statements of the MFS Funds; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

34.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

10

burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Trustee Defendants Breached Their
### Fiduciary Duties To MFS Funds Investors

35.    MFS Funds public filings state that the MFS Funds have boards of trustees that are responsible for the management and supervision of each fund. In this regard, the most recent Statement of Additional Information for various classes of the Massachusetts Investors Trust (the "Statement of Additional Information"), which is available to the investor upon request, is typical of the Statements of Additional Information available for other MFS Funds. It states that, "[t]he Board of Trustees which oversees the Fund provides broad supervision over the affairs of the Fund. The Adviser is responsible for the investment management of the Fund's assets, and the officers of the Trust are responsible for its operations."

36.    Moreover, the Statement of Additional Information states, with respect to the duties of the trustees vis-à-vis the funds' investment adviser, as follows:

> Investment Advisory Agreement – The Adviser manages the Fund pursuant to an Investment Advisory Agreement (the "Advisory Agreement") for all of the Funds in the Trust. Under the Advisory Agreement, the Adviser provides the Fund with overall investment advisory services. *Subject to such policies as the Trustees may determine, the Adviser makes investment decisions for the Fund.* For these services and facilities, the Adviser receives an annual investment advisory fee, computed and paid monthly [...]

> *     *     *

> The Advisory Agreement has an initial two-year term and continues in effect thereafter only if such continuance is specifically approved at least annually by the Board of Trustees or by vote of a majority of the Fund's shares [...] and, in either case, by a majority of the Trustees who are not parties to the Advisory Agreement or interested persons of any such party.

11

[Emphasis added.] The trustees of each fund are thus responsible for the review and approval of the advisory and fee agreements between MFS Company and the MFS Funds.

37.    The Statement of Additional Information also sets forth in greater detail the purported process by which the investment adviser is approved:

> In connection with their deliberations with regard to approval of the Fund's current investment advisory agreement with MFS [Company], the Trustees considered such information and factors as they believe, in the light of the legal advice furnished to them and their own business judgment, to be relevant to the interests of the shareholders of the Fund. Such factors include the nature, quality and extent of the services furnished by MFS to the Fund; the investment record of the Fund; *comparative data as to investment performance, advisory fees and expense ratios*; *possible economies of scale*; the necessity of MFS maintaining its ability to continue to retain and attract capable personnel to serve the Fund; the risks assumed by MFS; possible benefits to MFS from serving as adviser of the Fund and from providing certain administrative services to the Fund and from affiliates of MFS serving as principal underwriter and shareholder servicing agent of the Fund; current and developing conditions in the financial services industry, including the entry into the industry of large and well-capitalized companies which are spending and appear to be prepared to continue to spend substantial sums to engage personnel and to provide services to competing investment companies; the existence of appropriate incentives to assure that MFS will continue to furnish high quality services to the Fund; and various other factors.

> *   *   *

> Based upon their review, the Trustees determined that the investment advisory agreement was reasonable, fair and in the best interests of the Fund and its shareholders. The Trustees also concluded that the fees provided in the investment advisory agreement were fair and reasonable in light of the usual and customary charges made by others for services of the same nature and quality.

[Emphasis added.]

38.    The Investment Company Institute ("ICI"), of which MFS Investment Management is a member, recently described the duties of mutual fund boards as follows:

More than 77 million Americans have chosen mutual funds to gain convenient access to a professionally managed and diversified portfolio of investments.

Investors receive many other benefits by investing in mutual funds, including strong legal protections and full disclosure. In addition, shareholders gain an extra layer of protection because each mutual fund has a board of directors looking out for shareholders' interests.

***Unlike the directors of other corporations, mutual fund directors are responsible for protecting consumers, in this case, the funds' investors. The unique "watchdog" role, which does not exist in any other type of company in America, provides investors with the confidence of knowing the directors oversee the advisers who manage and service their investments.***

***In particular, under the Investment Company Act of 1940, the board of directors of a mutual fund is charged with looking after how the fund operates and overseeing matters where the interests of the fund and its shareholders differ from the interests of its investment adviser or management company.***

[Emphasis added.][1]

39.    In truth and in fact, the MFS Funds boards of trustees, *i.e.* the Trustee Defendants were captive to and controlled by MFS Company, who induced the Trustee Defendants to breach their statutory and fiduciary duties to manage and supervise the MFS Funds, approve all significant agreements and otherwise take reasonable steps to prevent MFS Company from skimming MFS Funds assets. In many cases, key MFS Funds trustees were employees or former employees of MFS Company and were beholden for their positions, not to MFS Funds investors, but, rather, to MFS Company, whom they were supposed to oversee. The Trustee Defendants served for indefinite terms at the pleasure of MFS Company and formed supposedly independent

---

[1]    The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The quotation above is excerpted from a paper entitled *Understanding the Role of Mutual Fund Directors,* available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

committees, charged with responsibility for billions of dollars of fund assets (much of which were comprised of investors' college and retirement savings).

40.     To ensure that the trustees toed the line, MFS Company often recruited key fund trustees from its own ranks.  For example, during the Class Period, defendants Shames, Ballen and Parke were Trustees charged with overseeing all of the 112 funds that make up the MFS fund complex.  Additionally, during the Class Period, Shames served as Chairman of MFS Company, Ballen served as Chief Executive Officer and Director of MFS Company and Parke served as President, Chief Investment Officer and Director of MFS Company.

41.     In exchange for creating and managing the MFS Funds, including the Massachusetts Investors Trust, MFS Company charged the MFS Funds a variety of fees, each of which was calculated as a percentage of the funds' average daily net asset value.  Hence, the more money invested in the funds, the greater the fees paid to MFS Company.  In theory, the fees charged to fund investors are negotiated at arm's-length between the fund board and the investment management company and must be approved by the independent members of the board.  However, as a result of the Trustee Defendants' dependence on the investment management company, and their failure to properly manage the investment adviser, millions of dollars in MFS Funds assets were transferred through fees payable from MFS Funds assets to MFS Company that were of no benefit to fund investors.

42.     As a result of these practices, the mutual fund industry was enormously profitable *for MFS Company.* In this regard, a *Forbes* article, published on September 15, 2003, stated as follows:

> The average net profit margin at publicly held mutual fund firms
> was 18.8% last year, blowing away the 14.9% margin for the
> financial industry overall . . . . [f]or the most part, customers do not
> enjoy the benefits of the economies of scale created by having
> larger funds. ***Indeed, once a fund reaches a certain critical mass,***

14

> *the directors know that there is no discernible benefit from having the fund become bigger by drawing in more investors; in fact, they know the opposite to be true - once a fund becomes too large it loses the ability to trade in and out of positions without hurting its investors.*
>
>       \*    \*    \*
>
> *The [mutual fund] business grew 71-fold (20 fold in real terms) in the two decades through 1999, yet costs as a percentage of assets somehow managed to go up 29%....* Fund vendors have a way of stacking their boards with rubber stamps. As famed investor Warren Buffett opines in Berkshire Hathaway's 2002 annual report: 'Tens of thousands of "independent" directors, over more than six decades, have failed miserably.' A genuinely independent board would occasionally fire an incompetent or overcharging fund advisor. That happens just about never."

[Emphasis added.]

43.     Plaintiff and other members of the Class never knew, nor could they have known, from reading the fund prospectuses or otherwise, of the extent to which MFS Company was using so-called 12b-1 fees, Soft Dollars (as defined below) and commissions to improperly siphon assets from the funds.

## MFS Company Used Rule 12b-1
## Marketing Fees For Improper Purposes

44.     Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their own shares unless certain enumerated conditions set forth in Rule 12b-1 are met. The Rule 12b-1 conditions, among others, are that payments for marketing must be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan must be approved by a vote of the majority of the board of directors; and the board of directors must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the directors "have a duty to request and

15

evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether the plan should be implemented or continued." The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the Act that *there is a reasonable likelihood that the plan will benefit the company and its shareholders."* [Emphasis added.]

45.    The Rule 12b-1 exceptions to the Section 12(b) prohibition on mutual fund marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things being equal, should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors. During the Class Period, the Trustee Defendants authorized, and MFS Company collected, millions of dollars in purported Rule 12b-1 marketing and distribution fees.

46.    However, the purported Rule 12b-1 fees charged to MFS Funds investors were highly improper because the conditions of Rule 12b-1 were not met. There was no "reasonable likelihood" that the 12b-1 plans would benefit the company and its shareholders. On the contrary, as the funds were marketed and the number of fund investors increased, the economies of scale thereby created, if any, were not passed on to MFS Funds investors. Rather, MFS Funds management and other fees steadily increased throughout the Class Period. This was a red flag that the Trustee Defendants knowingly or recklessly disregarded. In truth, the MFS Funds marketing efforts were creating diminished marginal returns under circumstances where increased fund size correlated with reduced liquidity and fund performance. If the Trustee Defendants reviewed written reports of the amounts expended pursuant to the MFS Funds Rule

16

12b-1 plans, and the information pertaining to agreements entered into pursuant to the Rule 12b-1 plans, on a quarterly basis as required — which seems highly unlikely under the circumstances set forth herein — the Trustee Defendants either knowingly or recklessly failed to terminate the plans and the payments made pursuant to the Rule 12b-1 plans, even though such payments not only harmed existing MFS Funds shareholders, but also were improperly used to induce brokers to breach their duties of loyalty to their prospective MFS Funds investors.

47.    Many of the MFS Funds charging Rule 12b-1 fees charged investors the maximum fees permissible pursuant to the MFS Funds Rule 12b-1 plans. There was no reasonable likelihood that the Rule 12b-1 fees would benefit the funds or their shareholders because the increased fees charged to shareholders created diminished marginal returns. Therefore, the Rule 12b-1 plans authorizing such fees should have been terminated.

48.    As set forth below, in violation of Rule 12b-1 and Section 28(e) of the Securities Exchange Act, defendants made additional undisclosed payments to brokers in the form of excessive commissions that were not disclosed or authorized by the MFS Funds Rule 12b-1 plans.

### MFS Company Charged Its Overhead To MFS Funds Investors And Secretly Paid Excessive Commissions To Brokers To Steer Clients To MFS Funds

49.    Investment advisers routinely pay broker commissions on the purchase and sale of fund securities, and such commissions may, under certain circumstances, properly be used to purchase certain other services from brokers as well. Specifically, the Section 28(e) "safe harbor" provision of the Securities Exchange Act carves out an exception to the rule that requires investment management companies to obtain the best possible execution price for their trades. Section 28(e) provides that fund managers shall not be deemed to have breached their fiduciary duties "solely by reason of [their] having caused the account to pay a . . . broker . . . in excess of

17

the amount of commission another . . . broker . . . would have charged for effecting the transaction, if such person determined *in good faith* that the amount of the commission is reasonable in relation to the value of the brokerage and research services provided." 15 U.S.C. §28(e) (emphasis added). In other words, funds are allowed to include in "commissions" payment for not only purchase and sales execution, but also for specified services, which the SEC has defined to include, "any service that provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities." The commission amounts charged by brokerages to investment advisers in excess of the purchase and sale charges are known within the industry as "Soft Dollars."

50.    MFS Company went far beyond what is permitted by the Section 28(e) safe harbor. MFS Company used Soft Dollars to pay overhead costs, thus charging MFS Funds investors for costs not covered by the Section 28(e) safe harbor and that, consistent with the investment advisers' fiduciary duties, properly should have been borne by MFS Company. MFS Company also paid excessive commissions to broker dealers on top of any supposedly justifiable Soft Dollars to steer their clients to MFS Funds and directed brokerage business to firms that favored MFS Funds. Such payments and directed-brokerage payments were used to fund sales contests and other undisclosed financial incentives to push MFS Funds. These incentives created an undisclosed conflict of interest and caused brokers to steer clients to MFS Funds regardless of the funds' investment quality relative to other investment alternatives and to thereby breach their duties of loyalty. By paying the excessive brokerage commissions, MFS Company also violated Section 12(b) of the Investment Company Act because such payments were not made pursuant to valid Rule 12b-1 plans.

51.    The excessive commissions did not fund any services that benefited the MFS Funds shareholders. This practice materially harmed Plaintiff and other members of the Class from whom the Soft Dollars and excessive commissions were taken.

52.    Additionally, on information and belief, the MFS Funds, similar to other members of the industry, have a practice of charging lower management fees to institutional clients than to ordinary mutual fund investors through their mutual fund holdings. This discriminatory treatment cannot be justified by any additional services to the ordinary investor and is a further breach of fiduciary duties.

## THE NOVEMBER 17, 2003 ANNOUNCEMENT

53.    On November 17, 2003, these abusive and improper practices began to come to light when the SEC issued a press release (the "November 17 SEC Release") in which it announced a $50 million settlement of an enforcement action against Morgan Stanley Dean Witter relating to improper mutual fund sales practices. The MFS Funds were identified the next day as one of the mutual fund families that Morgan Stanley brokers were improperly paid to push. In this regard, the release announced:

> the institution and simultaneous settlement of an enforcement action against Morgan Stanley DW Inc. (Morgan Stanley) for failing to provide customers important information relating to their purchases of mutual fund shares. As part of the settlement, Morgan Stanley will pay $50 million in disgorgement and penalties, all of which will be placed in a Fair Fund for distribution to certain Morgan Stanley customers.
>
> *Stemming from the SEC's ongoing industry-wide investigation of mutual fund sales practices, this inquiry uncovered two distinct, firm-wide disclosure failures by Morgan Stanley. The first relates to Morgan Stanley's "Partners Program" and its predecessor, in which a select group of mutual fund complexes paid Morgan Stanley substantial fees for preferred marketing of their funds.* To incentivize its sales force to recommend the purchase of shares in these "preferred" funds, Morgan Stanley paid increased compensation to individual registered representatives and branch

19

managers on sales of those funds' shares. The fund complexes paid these fees in cash or in the form of portfolio brokerage commissions.

*Id.* [Emphasis added.]

54.    The November 17 SEC release further stated:

The Commission's Order finds that this conduct violated Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934. Section 17(a)(2) prohibits the making of materially misleading statements or omissions in the offer and sale of securities. Rule 10b-10 requires broker dealers to disclose the source and amount of any remuneration received from third parties in connection with a securities transaction. The Order also finds that the conduct violated NASD Rule 2830(k), which prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions.

Stephen M. Cutler, Director of the Commission's Division of Enforcement, said: "Unbeknownst to Morgan Stanley's customers, Morgan Stanley received monetary incentives -- in the form of 'shelf space' payments -- to sell particular mutual funds to its customers. When customers purchase mutual funds, they should understand the nature and extent of any conflicts of interest that may affect the transaction."

Morgan Stanley has agreed to settle this matter, without admitting or denying the findings in the Commission's Order. As part of the settlement, Morgan Stanley will pay $25 million in disgorgement and prejudgment interest. In addition, Morgan Stanley will pay civil penalties totaling $25 million.

\* \* \*

In addition, Morgan Stanley has undertaken to, among other things, (1) place on its website disclosures regarding the Partners Program; (2) provide customers with a disclosure document that will disclose, among other things, specific information concerning the Partners Program, and the differences in fees and expenses connected with the purchase of different mutual fund share classes.

Finally, the Commission's Order censures Morgan Stanley and orders it to cease-and-desist from committing or causing any violations of Section 17(a)(2) of the Securities Act of 1933 and Rule 10b-10 under the Securities Exchange Act of 1934.

\* \* \*

20